LAWRENCE J. KING (CSB #120805)
6 "C" STREET
PETALUMA, CA 94952
PHONE: (707) 769-9791
FAX:     (707) 769-9253

ATTORNEY FOR PLAINTIFF
VINCENT OBIAJULU

# THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VINCENT OBIAJULU,<br><br>Plaintiff,<br><br>v.<br><br>SAN MATEO COUNTY PROBATION DEPARTMENT,<br><br>Defendant. | CASE NO.<br><br>PLAINTIFF'S COMPLAINT<br><br>AND<br><br>JURY DEMAND |

**PLAINTIFF VINCENT OBIAJULU** hereby files suit, demands a jury trial, and alleges as follows:

## JURISDICTION

1. Plaintiff brings this suit pursuant to 28 U.S.C. Sections 1331, 1343 and 1367 and 42 U.S.C. sections 2000e, *et seq*. Plaintiff's substantive claims arise under Title VII of the 1964 Civil Rights Act, 42 U.S.C. sections 2000e, *et seq*., and California's Fair Employment and Housing Act, California Government Code Section 12900, *et. seq*.

## PARTIES, VENUE AND INTRADISTRICT ASSIGNMENT

2. Plaintiff is, and was at all times relevant herein, a resident of San Mateo County, California and an employee of the San Mateo County Probation Department ("SMCPD"), located in San Mateo County, California.

3. The SMCPD is a department of the County of San Mateo that is responsible for

operating the County's probation programs, its jails and its youth correctional facilities, including Camp Glenwood Boys Ranch, a juvenile detention facility.

4. Some or all of the acts about which Plaintiff complains occurred in San Mateo County, California, which is located within the Northern District of California and cases arising therein are assigned either to the Oakland or San Francisco Division, pursuant to L.R. 3-2(d).

## FACTS COMMON TO ALL CLAIMS

5. In May 2001, Plaintiff applied for a Group Supervisor II (GSII) position with the SMCPD.

6. The educational requirement for a GSII position is a degree from an accredited four year college or university. The educational requirement for a Group Supervisor I (GSI) position requires completion of at least 60 semester or 90 quarter units from an accredited college or university. Plaintiff had a four degree from an accredited university. During the course of his employment with the SMCPD, he went to graduate school and received a graduate degree from an accredited university.

7. Plaintiff successfully completed and passed all the SMCPD'S hiring requirements, which included, but are not limited to a background investigation, citizenship verification, peace officer-related psychological evaluation, physical fitness test, drug and alcohol screening, written exercises, panel interviews, and finger printing. On Monday September 17, 2001, Plaintiff received a telephone call from Ms. Cindy Crowe-Urgo, Director, Camp Glenwood, a youth facility run by the SMCPD. Ms. Crowe-Urgo informed Plaintiff that she was aware that he had applied for a GSII position. However, she stated that she only had a GSI position on a graveyard shift with full benefits. She promised Plaintiff a GSII position as soon as one became available, if he accepted the GSI position. With the promise of a GSII position in mind, Plaintiff accepted the GSI position. On Tuesday, September 18, 2001, Plaintiff started working at Camp Glenwood.

8. A few months later, Mr. Glen Sugiyama was hired as a GSII. When Plaintiff inquired about the hiring of Mr. Sugiyama, he was told by Ms. Crowe-Urgo that she thought Plaintiff's name had expired and consequently expunged from the active list of candidates. This turned out to be a

2
**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

1  mistake.

2  9.      Plaintiff subsequently learned that a Mr. Bernstein, GSIII, was about to vacate his position and go back to school and that Mr. Moore, GSII, might be moved up to Mr. Bernstein's position thereby leaving Mr. Moore's position available. In a January 10, 2001, letter to Ms. Crowe-Urgo, Plaintiff requested that he be considered for the GSII position about to be vacated by Mr. Moore.

10.     In response to Plaintiff's January 10, 2001 letter, Ms. Crowe-Urgo told Plaintiff that she had referred his letter to the Institutional Service Managers ("ISM") and that they would be contacting Plaintiff to discuss his interest in a GSII position and its requirements. Plaintiff met with ISMs Calhoun and Johnson to discuss his letter to Ms. Crowe-Urgo and the requirements for a GSII position. Three other meetings were scheduled. About two weeks later, Plaintiff met with ISMs Calhoun and Johnson. At this second meeting, both ISMs Calhoun and Johnson pointed out that they did not see anything in Plaintiff's work record that would prevent Plaintiff from performing well as a GSII. The last two meetings were just between ISM Johnson and Plaintiff. ISM Calhoun did not come to these last two meetings, and ISM Johnson could not give Plaintiff any reason why she did not come. ISM Johnson did, however, reiterate that Plaintiff was doing a good job and that he did not see any reason why Plaintiff could not become a GSII. However, Plaintiff was not promoted to a GSII position at that time.

11.     On March 22, 2002, Plaintiff received his first and only employee evaluation from ISM Crandall shortly before ISM Crandall was transferred to a different division within the Probation Department. Plaintiff's overall evaluation was Competent out of possible Exceptional, Competent, Improvement Needed, or Unsatisfactory. In the sub-factor ratings, Plaintiff received 4 Exceptional, 16 Competent, and 0 Weak ratings.

12.     On April 1, 2002, Plaintiff was assigned, by Ms. Calhoun, to train Mr. Brian Barber, a PPT-GSI (Permanent Part-Time Group Supervisor I). Mr. Barber was subsequently promoted to GSIII and became one of Plaintiff's supervisors. Several other staff have either been hired or promoted to a GSII or DPO (Deputy Probation Officers) positions since Plaintiff's employment

3

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

commenced on September 18, 2001. Numerous other individuals were promoted over Plaintiff due to his national origin, including the following. Mr. Clifford, a Caucasian American male was hired as a PPT-GSI, but became a GSII within just a few months. Mr. Wallace Richwood, a Caucasian American male was hired as extra help, but was given a GSII position within a few months, and now has been promoted to GSIII. Ms. Sanam Aram, a part-time extra help, just became a DPO. Mr. Joaquin Jimenez was hired as a part-time extra help, but today he is a GSII. Mr. Nicholas Haberlach was hired as a part-time extra help. He became a GSI and is usually made a lead staff and, consequently, Plaintiff's supervisor during a shift despite the fact that Plaintiff helped train him. Mr. Sisavath was hired as a part-time extra help, but within few months, he was promoted to a GSII.

13. Ms. Jaime Cuff was given the GSII position vacated by Mr. Moore. Ms. Cuff, a Caucasian American female, went from extra help to a GSI, and then to a GSII within a few months. Though Plaintiff was there when Ms. Cuff was hired, Plaintiff is still a GSI.

14. On March 11, 2004, a memo was sent out to all the permanent part-time staff by ISM Bill Johnson about rotation of staff through unfilled GSII positions. On March 17, 2004, Plaintiff expressed his interest in participating in this position rotation. Plaintiff never got any reply back from Mr. Johnson.

15. On November 8, 2004, Plaintiff sent a letter to Ms. Crowe-Urgo via e-mail in which Plaintiff pointed out how Plaintiff was being discriminated against. Ms. Calhoun was incensed by this letter to Ms. Crowe-Urgo, and became very vindictive and malicious towards Plaintiff as a result. As part of her retaliation, she started putting damaging documents in Plaintiff's personnel file without Plaintiff's knowledge or allowing Plaintiff an opportunity to respond.

16. On November 26, 2004, Plaintiff met with Ms. Calhoun. When Plaintiff asked her why she was not giving him a chance to rotate into the "lead" position (acting GSII position), Ms. Calhoun said that she only chooses people she likes for a lead staff position on shift. Additionally, she said that she wants "someone that people can understand." When Plaintiff asked her if it was because of Plaintiff's accent, she said "yeah, it is because of your accent. I am not going to make you a lead because no one can understand you." She said, "You should be glad you have a job. We

get paid way too much money to baby-sit these kids. Instead of being grateful to live in this country, you have the audacity to complain about being promoted or who I make a lead staff. There are so many unemployed Americans out there. You have no right to complain." At this point, Plaintiff stated to Ms. Calhoun that Plaintiff could not change who he is and that he did not choose which part of the world to be born in or what his skin color would be. However, Plaintiff pointed out to her that he is a human being and that he bleeds red blood like everyone else if his skin is cut. The thought of losing his job and, thereby, his ability to provide for his family (at this time Plaintiff's twins were 13 months old and Plaintiff's oldest son was 6 years old) cascaded through Plaintiff's mind. At the same, Plaintiff was full of trepidation. Ms. Calhoun, though not a director, ran the Camp. She had the power to influence the termination of Plaintiff's employment or make Plaintiff's job a living hell simply because of her hatred towards Plaintiff due to Plaintiff's nationality. She was right that Plaintiff was born in another country and that Plaintiff has an accent. However, no one had ever complained that they could not understand Plaintiff due to his accent. Plaintiff begged her to spare his employment. Plaintiff promised her that he would no longer complain about not being assigned as a lead staff or remind management of the promised GSII position.

17. On March 18, 2005 Plaintiff met Camp Glenwood's new director, Ms. Maryanne O'Shea. Ms. O'Shea had replaced Ms. Crowe-Urgo. The meeting was cordial. Plaintiff had walked into her office and introduced himself. She stated that Plaintiff was one of two staff members that she had not met yet. She asked Plaintiff how long Plaintiff had been working at the camp. She indicated to Plaintiff that she would not be fully available at the Camp for another month or so because she still had some unfinished work in other divisions that she managed. She stated to Plaintiff that she has an open door policy and that Plaintiff should feel free to come in and talk to her.

18. The second time Plaintiff met Ms. O'Shea was around late May or early June 2005. Suddenly, Ms. O'Shea appeared very hostile towards Plaintiff. She, by insinuation, called Plaintiff a liar. When Plaintiff asked what she was talking about, she responded by asking "Do you mean that everything I have heard and read about you is not true?" Plaintiff indicated to her that Plaintiff did not know what she knew or read about him. As Plaintiff was about to explain to her the problem

Plaintiff was having with Ms. Calhoun, she interrupted and informed Plaintiff that she does not talk about people in their absence. At this point, Plaintiff asked if she could do Plaintiff a favor by giving Plaintiff the opportunity to respond to any negative or damaging rumor she hears about him. "Fair enough," she said.

19. On May 7, 2005, Plaintiff received a MBA degree with concentration in Finance from Notre Dame de Namur University in Belmont, California.

20. On June 12, 2005, Plaintiff stated to ISM Johnson that Plaintiff was being discriminated against by Ms. Calhoun due to Plaintiff's nationality. Also, Plaintiff told ISM Johnson that Ms. Calhoun was out to destroy Plaintiff's family and Plaintiff's career because of Plaintiff's letter to Ms. Crowe-Urgo and because of her hatred towards Plaintiff due to Plaintiff's national origin. Plaintiff explained to him that he just wanted to be treated fairly like everyone else.

21. On June 14, 2005 Plaintiff called Mr. David Silberman, an Assistant San Mateo County Attorney, and asked if Plaintiff could talk to him about Ms. Calhoun's discrimination towards Plaintiff due to Plaintiff's national origin. David Silberman declined to talk to Plaintiff on the grounds that if Plaintiff were to sue the County that he would have to defend the County.

22. On June 16, 2005, Plaintiff asked ISM Johnson if Plaintiff could look at his personnel file. ISM Johnson told Plaintiff that he could look at it, but that he could not take it out of his office. As ISM Johnson pulled the file from the file cabinet drawer, Plaintiff could not help but comment on how voluminous it was. As Plaintiff glanced through the documents in the file, Plaintiff noticed damaging documents that were generated by Ms. Calhoun. Plaintiff was so shocked by what he saw in his file that his head started to hurt. Plaintiff's heart rate increased rapidly. Plaintiff started to tremble and he developed a pounding headache. Due to lack of time and the shock that affected Plaintiff's system, Plaintiff asked Mr. Johnson if he could make copies to read at a later time. Johnson said that he would have to check with personnel to find out if Plaintiff could make copies of the documents in Plaintiff's personnel file. Plaintiff has not been allowed to make copies and Plaintiff was never given an opportunity to respond to the damaging documents in his personnel file.

23. Ironically, Plaintiff's letter to Ms. Crowe-Urgo dated November 8, 2004, was missing

from Plaintiff's personnel file. It seemed that the new director was not able to see or read that letter. Evidently, Ms. O'Shea, the new director, read Plaintiff's file and formed a very negative opinion of Plaintiff without having any kind of interactions with him.

24. On December 24, 2005, Plaintiff filed a "charge of discrimination" with the California Department of Fair Employment and Housing ("DFEH") and the United States Equal Employment Opportunity Commission ("EEOC"). On May 18, 2007, the EEOC issued a Plaintiff a "right-to-sue" letter concerning his original EEOC charge (#370-2006-00490).

25. After Plaintiff filed his original EEOC charge, he was subjected to continuing discrimination and retaliation. In addition, Plaintiff applied for four (4) positions for which he was qualified, and was rejected for each of these positions. Other less qualified candidates were chosen instead of Plaintiff or, in some cases, the positions were left unfilled. The positions for which he applied and was rejected were as follows: (1) Vocational Rehabilitation Manager; (2) Deputy Director of Administration; (3) Institutional Services Manager; and (4) Deputy Director of Probation Services.

26. On June 1, 2007, Plaintiff filed a second "charge of discrimination" with the DFEH and the EEOC concerning the continuing discrimination and retaliation to which he was being subjected, and the refusal of the SMCPD to hire him for positions for which he was qualified. On July 6, 2007, the EEOC issued Plaintiff a "right-to-sue" letter concerning this second charge (#550200701552).

**FIRST CAUSE OF ACTION:
DISCRIMINATION AND HARASSMENT
IN VIOLATION OF TITLE VII.**

27. Plaintiff incorporates ¶¶ 1-26, as if set forth herein.

28. Title VII of the Civil Rights Act of 1964, as amended, prohibits discrimination on the basis of national origin. Defendant's conduct, as set forth above, violated Title VII's prohibition against discrimination.

29. Title VII also requires that employers take timely and appropriate steps to investigate and remedy acts of discrimination. Defendant's failure to investigate and remedy the discrimination

1  to which Plaintiff was subjected, as outlined above, violated Title VII.

2  30.  As a result of Defendant's violations of Title VII, Plaintiff has, and will continue to, suffer damages, including, but not limited to, lost income and benefits, emotional distress, embarrassment, humiliation, loss of enjoyment of life, and damage to his health and to his personal and professional reputations.

**SECOND CAUSE OF ACTION:
RETALIATION
IN VIOLATION OF TITLE VII**

31.  Plaintiff incorporates ¶¶ 1-26, as if set forth herein.

32.  Title VII of the Civil Rights Act of 1964, as amended, prohibits retaliation against employees who oppose or report discrimination on the basis of national origin in their employment. Defendant's conduct, as set forth above, violated Title VII's prohibition against discrimination.

33.  Title VII also requires that employers take timely and appropriate steps to investigate and remedy retaliatory conduct. Defendant's failure to investigate and remedy the retaliation to which Plaintiff was subjected, as outlined above, violated Title VII.

34.  As a result of Defendant's violations of Title VII, Plaintiff has, and will continue to, suffer damages, including, but not limited to, lost income and benefits, emotional distress, embarrassment, humiliation, loss of enjoyment of life, and damage to his health and to his personal and professional reputations.

**THIRD CAUSE OF ACTION:
DISCRIMINATION AND HARASSMENT
IN VIOLATION OF FEHA**

35.  Plaintiff incorporates ¶¶ 1-26, as if set forth herein.

36.  California's Fair Employment and Housing Act ("FEHA"), California Government Code Section 12900, *et. seq.*, prohibits employment discrimination and harassment on the basis of gender and national origin. Further, FEHA requires that employers take timely and appropriate steps to investigate and remedy discrimination and harassment after it is reported.

37.  Defendant's conduct, outlined above, violated FEHA.

38.  As a result of Defendant's violations of FEHA, Plaintiff has, and will continue to,

1  suffer damages, including, but not limited to, lost income and benefits, emotional distress,
2  embarrassment, humiliation, loss of enjoyment of life, and damage to his health and to his personal
3  and professional reputations.

**FOURTH CAUSE OF ACTION:**
**RETALIATION**
**IN VIOLATION OF FEHA**

6      39.    Plaintiff incorporates ¶¶ 1-26, as if set forth herein.

7      40.    California's Fair Employment and Housing Act ("FEHA"), California Government
8  Code Section 12900, *et. seq.*, prohibits retaliation against employees who oppose or complain about
9  discrimination and harassment on the basis of their gender or national origin. Further, FEHA
10 requires that employers take timely and appropriate steps to investigate and remedy retaliation.

11     41.    Defendant's conduct, outlined above, violated FEHA.

12     42.    As a result of Defendant's violations of FEHA, Plaintiff has, and will continue to,
13 suffer damages, including, but not limited to, lost income and benefits, emotional distress,
14 embarrassment, humiliation, loss of enjoyment of life, and damage to his health and to his personal
15 and professional reputations.
16 his health and to his personal and professional reputations.

**PRAYER FOR DAMAGES**

18 WHEREFORE, Plaintiff prays for judgment against Defendants, individually and severally,
19 granting the following relief:

20     a.    A declaration of his right to work in an environment free from discrimination and
21 retaliation;

22     b.    An injunction requiring the named individual defendant officials to institute
23 appropriate policies and procedures to insure the timely investigation and remedy of discrimination,
24 harassment, and retaliation claims;

25     c.    Compensatory damages, including but not limited to, lost wages and benefits, loss
26 of peace of mind and enjoyment of life, damage to his health and reputation, emotional distress, and
27 other specific and general damages in an amount proven at trial;

28

| | | |
|---|---|---|
| 1 | d. | Exemplary and punitive damages in an amount to be proven at trial; |
| 2 | e. | Attorney's fees and costs; |
| 3 | f. | Prejudgment and post judgment interest; |
| 4 | g. | Any other relief to which Plaintiff may be entitled upon proof at trial that the Court |

deems just and proper.

Dated: July 27, 2007                LAW OFFICES OF LAWRENCE J. KING

By: _____
Lawrence J. King
**ATTORNEY FOR PLAINTIFF**